## Case No. 13,312.

### The STAR OF HOPE.

### [1 Hask. 36.] [1]

### District Court, D. Maine. Dec., 1866. [2]

CHARTER PARTY — TENDERING VESSEL — DELAY — WHEN EXCUSABLE—EXPRESS AND IMPLIED WARRANTIES — SUSPENDED CONTRACT — SEAWORTHINESS.

1. A charter-party, to commence when vessel is ready to receive cargo at place of lading and notice thereof is given charterers, requires the ship-owner to use due diligence in dispatching the vessel and prosecuting the voyage to the port of lading.

2. Inevitable accident or perils of the sea, that delay the vessel in reaching the port of lading beyond the usual term of passage, do not relieve the charterers from their contract, if the vessel be tendered in a reasonable time.

3. An implied warranty or condition precedent, that the vessel is sea-worthy at the date of the charter, does not attach to such contract.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 4,710.]

4. Disability to perform implied covenants, without default on his part, will excuse a party. Not so where the covenants are express.

5. A contract may be suspended and not dissolved.

In admiralty. Libel by the owners of the Star of Hope in personam against the charterers of that vessel for freight due upon a charter-party, stipulating that the charter shall commence when the vessel is ready to receive cargo at the place of loading and notice thereof is given to the charterers. The respondents answer, that the delay of the vessel was so great in reporting for cargo, that they were relieved from the charter-party, and that the cargo was carried under a subsequent agreement at a stipulated freight that has been fully paid.

Nathan Cleaves and Joseph Howard, for libellants.

William L. Putnam and George Evans, for respondents.

FOX, District Judge. This charter-party was executed at Boston, on Thursday, the 27th of April, 1865, and recites that the vessel, then in Boston, was chartered for a voyage from Farmingdale, in Maine, to Fort Gaines, or Mobile, Ala., the owners covenanting that the brig should be kept tight, staunch and strong during said voyage, and the charterers, that they would furnish cargo sufficient for the loading,—lumber on deck, ice in the hold, and would pay the gross sum of $4,250 freight for the voyage as stipulated. Lay-days were agreed upon and demurrage provided for. The contract also stipulated that "this charter shall commence when the vessel is ready to receive cargo at the place of loading, and notice given to the party of the second part, the dangers of the seas and navigation of every nature and kind mutually excepted;" these two stipulations being contained in the printed portion of the charter. The vessel sailed from Boston on Tuesday, May 1, and did not arrive at Farmingdale until the 24th of May.

The respondents contend, that by reason of this delay they were exonerated from all liability under the charter-party, that the usual time for this vessel to have made the passage to Farmingdale would not have exceeded five or six days, and that it was in the nature of an implied warranty or condition precedent that the vessel should have sailed forthwith from Boston, and should be at Farmingdale ready for her cargo within the time such vessels usually make the voyage, and that as she did not sail forthwith from Boston, and did not arrive seasonably, they are thereby discharged from their obligation to receive and load the vessel when she did arrive and report herself in readiness.

The charter-party stipulates "that the charter shall commence when the vessel is ready to receive cargo and notice thereof given to the charterers." If this language is to be taken strictly and literally, I do not perceive

that there was any contract in force between the parties until the vessel arrived and reported at Farmingdale; and yet it would hardly be contended, in case this vessel had been sent on a different voyage by her owners, and the voyage contemplated by the charter-party entirely defeated, never commenced, that the owners would not have been accountable to the charterers for the damages sustained by them, and that they would have been justified in saying, the contract did not have any force or effect until the brig arrived at Farmingdale, and if it was for our interest to send her elsewhere, we had a right so to do without our incurring any liability to the other party by so doing.

In Lowber v. Bangs, 2 Wall. [69 U. S.] 728, which was an action for breach of a charter-party, Judge Swayne in delivering the opinion of the majority of the supreme court lays down the following rules, viz.: "That the construction to be put upon contracts of this sort depends upon the intention of the parties, to be gathered from the language of the individual instrument. All mercantile contracts ought to be construed according to the plain meaning to men of sense and understanding, and not according to forced and refined constructions which are intelligible only to lawyers, and scarcely to them. Contracts, when their meaning is not clear, are to be construed in the light of the circumstances surrounding the parties when they are made, and the practical interpretation which they by their conduct have given to the provisions in controversy."

Guided by these rules, there can be no doubt, although there is no express agreement in this instrument that the vessel should proceed to Farmingdale, and although it is expressly stated "that the charter shall commence when the vessel is reported ready to receive cargo at place of lading," that the owners nevertheless were under an obligation, growing out of this charter-party, that their vessel should sail for Farmingdale, and that the respondents should furnish her a cargo, and that this stipulation, as to the commencement of the charter, must be limited in its application to the terms and provisions therein expressed, which would naturally take effect and operate after the vessel's arrival at Farmingdale, and she had commenced loading under her charter.

No particular time being fixed by the agreement, either for the vessel's sailing from Boston or her arrival at Farmingdale, the contract in reference to these points being implied from the residue of the charter-party, what is the contract that the law implies these parties entered into? Is it, that the vessel, at the moment of the signing of the charter, is ready for sea and will sail forthwith, and will arrive within the usual time for such a voyage? Or is it, that the owners will use all diligence on their part, and as far forth as is in their power will expedite the purposes of the voyage, making no unreasonable

delay in its commencement or deviation after the voyage has once begun? Do the owners become insurers of the vessel's arrival within the usual time, and of her readiness to receive her cargo? Or are they excused, if by the perils of the sea the vessel is delayed and the voyage protracted, if she afterwards completes her passage and offers to receive and carry forward the cargo to the port of destination; is there an implied warranty or condition precedent, as to the time of the vessel's being ready to receive her cargo, when nothing of the kind is so expressed in the contract? If the owners had expressly stipulated that the vessel should be at Farmingdale on a day certain and report for cargo, no one will deny their power to have made such an agreement, or that the courts would hold them to its very letter, however unreasonable. But there is a clear distinction between express and implied obligations; as is well said, there is a distinction recognized by the courts between covenants implied by operation of law, and express covenants; the latter are taken more strictly, and for the reason, that when a party, by his own contract creates a duty or charge upon himself, he is bound to make it good, and is not excused, although prevented by inevitable necessity, because it is said he might have provided against it by his contract. On this ground it has been held, that if a ship be warranted to sail on or before a particular day, but is prevented from sailing on that day by an embargo, the warranty is not complied with. In the case of covenants implied by operation of law, if the party is disabled to perform without any default on his part, and has no remedy over, the law will excuse him. Fland. Shipp. 240, note. Upon general principles, in all contracts by charter-party, when there is no express agreement as to time, it is an implied stipulation that there should be no unreasonable or unusual delay in commencing the voyage. If the clause in this charter-party relating to the commencement of the charter had been omitted, if the vessel sailed seasonably on the voyage to Farmingdale, and was delayed by tempestuous weather, or driven out of her course to Bermuda, the authorities are very clear that the respondents would not thereby have been excused from loading the vessel on her arrival at Farmingdale, the owners being without fault. The owner must repair his vessel as soon as he reasonably can, and the charterers must await her readiness. "The carrier is not responsible for delay on the voyage on account of boisterous weather, adverse winds or low tides, or the like. These are dangers and accidents of navigation, over which he has no control, and against which his contract contains no warranty." Fland. Shipp. § 219.

In Clark v. Massachusetts, F. & M. Ins. Co., 2 Pick. 104, where a vessel, bound from Richmond, Va., to Nice, with a cargo of tobacco, was compelled to go into Kennebunk for repairs that detained her for two months,

it was decided that the merchant was bound to wait that time to enable the master to make his repairs; that the contract was only suspended by reason of the disaster which befell the ship, and that the master should have repaired and proceeded on his voyage; that neither party was at liberty to abandon the contract without the consent of the other, or without legal cause, which was not procured or caused by the fault of the party who relied upon it. It was in evidence in that case, that if the vessel had not met with the disaster, and had made her passage to Nice in the usual time, that the tobacco would have reached a market in season for the fall concours, there being two concours a year only for sale of tobacco for consumption in France, and that the object of the owners in the shipment was to get their tobacco to the French market at the time of the fall concours, and that this object would have been defeated by the delay which had been occasioned by the repair of the vessel, but the court held that disappointment of arrival could not control or affect the decision, that there was no stipulation that the voyage should be performed in any given time, and that the disaster was only a temporary suspension which did not discharge the parties from their contract.

This distinction between suspension and dissolution of the contract has been recognized and enforced in a great number of cases, some of them of very great hardship. In one case, where a ship was chartered and afterwards detained by an embargo for two years, it was decided that the contract remained in full force, and that the parties were bound to complete it, and the ship's owner was held responsible in damages for not going the voyage at the termination of the embargo. Hadley v. Clarke, 8 Term R. 259.

Lord Kenyon in his opinion there says: "If this contract were put an end to, it might equally be said, that interruptions to a voyage from other causes would also have put an end to it; e. g., a ship being driven out of her course, and yet that never was pretended. Instances of such interruption frequently occur in voyages from the northwest part of this kingdom to Ireland; sometimes ships are driven by the violence of the winds to ports in Denmark, where they have been obliged to winter. * * * I am of the opinion, however hard it may be to the defendants, the plaintiff is entitled to recover." So in The Nathl. Hooper [Case No. 10,032], Judge Story remarks: "Suppose a ship meets with a calamity in the course of her voyage, and is compelled to put into a port to repair, and there the cargo is required to be unlivered in order to make the repairs, or to insure its safety, or ascertain and repair the damage done to it. Would such an unlivery dissolve the contract for the voyage? Certainly not."

The reports abound with cases of this description, and no benefit can result from further citation from them. The principle is so well settled, that even when the vessel is chartered by the month, and is detained or delayed for repairs after the voyage commences, the charterer is obliged to pay for the time she is thus delayed. This principle is so well established, that I do not understand it as questioned by the learned counsel for respondent; but it is contended that, admitting such to be the law when the vessel meets with disasters in the prosecution of the voyage, it is not applicable to the present case, as the voyage stipulated for in the charter had not yet commenced. It is very certain that the vessel was bound to proceed from Boston to Farmingdale under implied conditions, as the charter party is silent on this subject; and it is difficult for me to find satisfactory reasons why any other conditions should arise or be implied, in relation to this portion of her undertaking, than the law would imply in case the charter had merely said, "vessel to proceed from Boston to Farmingdale," or the charter had commenced at Boston, and had provided for the vessel going in ballast from Boston to Farmingdale and load, and in these cases, if the vessel had been delayed by storms and needed repair, and so was compelled to refit, and delay was occasioned thereby, neither party would have been exonerated from the performance of the contract, if the vessel was seasonably repaired and arrived at place of loading.

In Touteng v. Hubbard, 3 Bos. & P. 291, the vessel was chartered for a voyage to St. Michaels for fruit from London, and being driven back to England by the weather, she was there detained by an embargo. Lord Alvanley says: "The construction of this charter is this, the captain agrees to go to St. Michaels, restraint of princes excepted, and the merchant engages to employ him and furnish the ship with a cargo. * * * The merchant would have been under the necessity of furnishing the ship with a cargo if she had arrived at St. Michaels as soon as she conveniently might after the embargo was taken off, although by arriving after the fruit season was over, the object of the voyage might be defeated. * * * The object of the voyage might equally have been defeated by the act of God as by the act of the state, as if the ship had been weather-bound until the fruit season was over, and yet in that case the merchant would have been compelled to fulfill his contract."

The counsel for respondents read the case of McAndrew v. Adams, 1 Bing. N. C., 29, and an examination of the case and of the opinions of the court I think will sustain my construction of the present contract.

Tindal, C. J., says: "The broad question is, whether upon the construction of the charter-party," which was to St. Michaels for fruit, "there has been unnecessary delay in commencing the voyage to St. Michaels.

Upon general principles in all contracts by charter-party, when there is no express agreement as to time, it is an implied stipulation that there shall be no unreasonable or unusual delay in commencing the voyage, and after it has been commenced no deviation; and the question here is, whether the defendant sailed within a reasonable time according to the terms of his charter-party. All the authorities concur in stating that the voyage must be commenced in a reasonable time. * * * Now inasmuch as the parties have stipulated that the lay-days shall commence on the first of December, it may be inferred that they contemplated the voyage to St. Michaels should terminate by that day. If indeed, by an accident or unforeseen cause which should excuse the master, the vessel should arrive later, the charterer would have no just cause of action." Thus clearly showing, that in the opinion of the court, when no time was fixed for the vessel's arrival at her post, if delayed by accident or perils of the sea, the charterer was not relieved from performance of his contract.

By an express contract for the vessel to proceed from Boston to Farmingdale, the risk of delay occasioned by perils of navigation must have been borne by the charterers. Why should there be any different rule, when the vessel is sailing under an implied instead of an express engagement. I cannot believe that the law will, under such circumstances, imply a liability which would not arise out of an express undertaking to perform the same services. Upon this part of the case, the remarks of Judge Ware, are quite appropriate. "It is usual," he says, "in charter-parties of affreightment, as well as in bills of lading, to insert a clause specially exempting the master and owners from losses occasioned by the dangers of the sea. This instrument contains no such exceptions, but this, as was justly contended in the argument for the respondents, is an exception which the law itself silently supplies, without its being formally expressed. It is a general rule of law, founded upon the plainest and most obvious principles of natural justice, that no man shall be held responsible for fortuitous events and accidents of major force, such as human sagacity cannot foresee, nor human providence provide against, unless he expressly agrees to take these risks upon himself. The liabilities of the owners in this case are precisely the same, and no more extensive than they would have been, if the usual exception of the dangers of the seas had been inserted in the charter-party." The Casco [Case No. 2,486.]

I am therefore of opinion, that the ship-owners in this case are under the same liabilities as to delays and risks from dangers of the sea, as they would have been under a charter commencing at Boston, and binding them to send their vessel to Farming-dale for a cargo. In that case, they would not assume the risks and delays from perils of the sea, and they did not under the present agreement.

The learned counsel for the respondents have called my attention to the case of Lowber v. Bangs, supra. In that case, a majority of the supreme court held that an express stipulation in a charter-party, that a vessel should proceed from one foreign port to another in a distant part of the globe "with all possible dispatch," was a warranty and condition precedent. The two judges from the great commercial circuits did not concur in this construction of the charter-party. I am bound to yield to the opinion of the majority, and whenever the precise question involved in Lowber v. Bangs is brought before me, it will be decided in accordance with that decision; but in the present case I do not perceive its applicability. I do not find any express stipulation in this charter-party touching the point in controversy, and sitting in admiralty, I am not disposed to interpolate any condition precedent into the obligations of the parties in this cause. If the party desired any such obligations, he should have incorporated them in the very words of his contract, and not have left it to me to find them there only by inference.

It is said, the vessel was not sea-worthy, either in Boston or on her passage from that place, on account of an auger hole in her bottom, and that there is always an implied warranty of the owners that the ship is sea-worthy. In this charter-party the owners expressly stipulate that on the voyage therein described, viz., from Farmingdale to Fort Gaines, the vessel shall be tight, staunch, &c., but nothing is said about her condition in Boston and during the intermediate voyage. Let us suppose that this vessel had sailed from Boston short-handed, or without a full supply of sails and provisions for the entire voyage, but that her crew and supplies were awaiting her at Farmingdale, and no delay whatever was caused by the want of them during the passage, and the vessel, properly manned and supplied, should seasonably report to the charterers for cargo, would they have been justified in refusing to load her, for the reason that she was short-manned, or short of supplies down from Boston? I think under such circumstances they would have been bound to comply with their contract. She is sea-worthy when she is in readiness to receive her cargo, and no delay has been occasioned by her want of sea-worthiness, and no injury has been sustained therefrom.

The conclusion to which I have arrived is, that the vessel being represented by the charter-party as being then in Boston, the respondents had a right to expect that she would proceed from that port to Farmingdale, without any unreasonable and unusual delay; that if by the perils of the sea the vessel on her passage was injured and not

unreasonably detained for the repairs, but the run was made with due diligence, and the vessel with proper dispatch proceeded to Farmingdale and offered to receive her cargo and complete the contract on her part, the respondents on their part were still under obligations to comply with it. I must then inquire whether there was any unreasonable delay at Boston.

The vessel arrived in April from a foreign voyage, and delivered her cargo in good order. She was taken on the railway for repairs and painting. She was metalled and left the ways on the 27th, the day of the execution of the charter-party. The precise time at which the charter was signed does not appear, but Friday was necessarily spent in procuring her crew and getting her stores on board, and on Saturday she was ready to sail. The wind was fair, the vessel laid with single fasts at the end of Long Wharf, and would have been off in twenty minutes, as one of the witnesses states, but she was then run into by a tug with another vessel in tow, and the jib boom of the Star of Hope was carried away in the collision. This of course detained her, and she was not ready until Tuesday of the next week, when she proceeded under tow to sea, the rigging of the jib boom being set up by the men as she went out of the harbor. I am of opinion that due diligence was used in repairing the jib boom, and that the damage occurred under such circumstances as constitute a disaster from the dangers of the sea, so that the owners are not chargeable for the delay.

The pilot, George Williams, had the general charge of the vessel, and the evidence is that he was an experienced and licensed pilot, qualified for his position. The vessel left the wharf about three o'clock Tuesday afternoon. Her pumps were tried that evening between Boston and Thatcher's Island, without the least indication of any leak. Her hatches had been off a considerable portion of the time after she left the ways. Witnesses say they were frequently in the hold, and all agree that the stores were perfectly dry. Nothing unusual occurred on Tuesday night, but on Wednesday morning the wind increased, being about N. N. E.; the pilot from time to time took in his light sails; about eleven the wind had so increased that it was a severe gale, and for five hours continued very violent, causing a heavy sea. Such was the force of the wind that the topmast-staysail was blown to pieces, although it had only been nine months in use, and was just out of the sail loft. In the afternoon of Wednesday, the pilot states "that the vessel then lying to was struck under the luff of the port bow by a very heavy sea, so violent that he was nearly thrown over, and he supposed at the moment that they must have run into a wreck; that previous to this time the vessel was perfectly tight, no water to be seen in the hold; but immediately afterwards they found from one to two feet of water in the hold." The leak increased, and all hands were put to the pumps and kept constantly at the brakes excepting when their assistance was necessary in working the vessel. The wind being ahead, the captain and pilot, after consulting, deemed it most prudent to bear away for Boston for repairs. This they attempted, but before reaching Thatcher's Island the wind came round, and finding they could reach the Kennebec river, they changed their course, and arrived at the river on Friday night and went up to Bath on Saturday.

On Thursday and Friday, the pumps were kept going a greater portion of the time. The wind abated and the sea fell on Thursday, and the leak decreased from 400 or 500 strokes per hour to about 200 which she was making when she got into the pier.

This vessel was fitted with a centre-board about twenty-four feet in length with a fall of about twelve feet. At the time she was struck by the heavy sea, the centre-board was down about four feet. The pilot says, "Previous to the sea striking us it had always worked well, but after that it was out of order and we could not make it work up or down."

A survey was held on the vessel at Bath, and she was ordered to Portland. There she was taken on the ways and a new survey called. On examination an auger hole 1⅛ inches in diameter was found in the bottom on the plank next to her garboard. The hole was bored through between the timbers, and was filled with chips and dirt wedged in quite tight, and apparently lodged there from the inside of the vessel; on the outside there was a thin shell of wood left by the auger. There was a little water weeping from this hole, and about the centre-board-box there were also some indications of leaking, but not to any great extent. This hole was stopped up, and the survey having recommended the centre-board-box to be closed, it was done and a shoe put on the keel. The vessel was put in good order at an expense of about $400, only $12 of which was for the calker's bill, and on the 17th of May she sailed for Farmingdale, where she arrived and claimed a cargo under the charter-party on the 24th.

I am satisfied the auger hole was in the vessel at the time she left Boston, and that the explanation of Thomas Knight well accounts for it. He gives it as his opinion, from its position and appearance, that it was made when the vessel was on the ways in Boston, to let out any water that might be in her, and that by the flood of water the chips and other substances were loaded and packed within the hole, being detained there by the external layer of the wood, not wholly cut away by the auger. It is clear from all the evidence that the vessel did not take the bottom from the time she left the railway in Boston till she was taken out in Portland. All the circumstances tend to show that the leak which occa-

sioned the delay was not owing to this hole, but that on the contrary it was filled and so stopped that but little if any water entered by it. If it had been clear, the vessel must have sunk before reaching Bath, as all the witnesses agree. The hole was tight in Boston. She laid there from Thursday till Tuesday, no water visible within her, and none indicated by the pumps there, or on the first day out. Soon after she was struck by the violent sea, she leaked very badly, so that she had from one to two feet of water in her hold, and for a time she continued thus to leak, the water diminishing as the sea went down; her centre-board was strained, so that it would not work, and as is well understood, vessels of this construction are liable to get out of order around the centre-board-box, and it is frequently difficult to reach and remedy the trouble. The board would act as a lever in a heavy sea, and might if struck violently strain open the seams of the box, which would remain open as long as the centre-board was out of place, but might afterwards come together when the strain was removed. I am therefore of opinion, that the necessity for repairs and the delay occasioned thereby must be ascribed to the perils of the sea, and under the circumstances that there was no lack of judgment on the part of the master in going to Bath in the first place instead of Portland. He was not aware of the nature of the injury, and did not know, so far as appears, whether the railway in Portland was in working order, it having been for a long time out of order, and at the time the vessel appeared to be strained in her upper works, which he may have supposed was the principal cause of her difficulty.

The vessel sailed from Portland the 18th, and reported at Farmingdale on the 24th. None of the crew have been examined, and no reason has been shown for this length of time being taken up by the voyage. It certainly was longer than I should have expected, but from all the testimony, I am satisfied the owners were desirous of completing the charter, and on some occasions made, I think, unusual exertions to expedite the purposes of the voyage. I feel justified, taking into consideration the season of the year and the state of the river at that time, together with the locality of Farmingdale, well up the river, in not charging them with unreasonable delay in reaching Farmingdale after the repairs were made.

The vessel reported for loading on the 24th, and the charterers refused to accept her, and so telegraphed to Boston, to which the owners replied insisting on a compliance with the charter-party, and on the 27th respondents telegraphed as follows. "We will load Hope, Fort Gaines and Mobile, at eight, measurement or weight. difference between old and new charter to be open for settlement by lawsuit or arbitration, without prejudicing rights of either party." To which on same day the owners replied, "We accept your proposition; load vessel as per dispatch." The vessel was loaded, and on the 22d of July discharged her cargo in good order at Fort Gaines, and the respondents paid freight thereon at rate of eight dollars per ton. The libel alleges that the cargo was carried under the charter-party. The answer claims it to have been under the new agreement, and that the libel should have been so framed, and that not being so, even if I am of opinion that the charter-party was in force and the respondents not exonerated from their liability, the libel in its present form cannot be sustained. I have felt the force of this objection, and have hesitated whether I should not yield to it. If I did, I should allow an amendment of the libel to meet the objection, as I think the merits are clearly with the libellants, and a court of admiralty is not inclined to discuss a meritorious cause upon mere technicalities, when they can be obviated by an amendment.

I consider the legal effect of the telegrams to amount to this. The respondents claimed they were discharged of their liability, which the owners denied. The vessel was ready for a cargo, and that the voyage might not be lost, she was to carry the cargo forward, the law or arbitration to determine whether the respondents were still bound by the charter; if so bound, the cargo was shipped under it, and they were bound to pay the charter money; if not so bound, the owners were to be entitled only to the eight dollars per ton as stipulated. It would have been more satisfactory if the libel had set forth this supplementary agreement.

It is claimed the purposes of the voyage were frustrated by this delay, and the respondents greatly damaged thereby; but on a careful examination of all the testimony, I am not satisfied that it was so. The cargo destined for the Hope was on government account, and was delivered at Fort Gaines and received by the government official, from the Star of Hope, without as appears, any claim for damages or delay. It is true, the respondents, about the 14th of May, chartered the M. C. Rosevelt and loaded her with ice, intending to send her to Fort Gaines instead of the Hope, but on the arrival of the latter vessel, the destination of the Rosevelt was changed to Pensacola, and it is in evidence from the letter of the respondents that they were in want of a vessel for that port. I think it was no disappointment to them that the destination was changed, but rather in accordance with their wishes. It is said, if the Star of Hope had delivered her cargo in the usual time at Fort Gaines, the respondents would have been able to have shipped another cargo that season to Mobile on which a profit would have been made, but by the delay they were prevented from doing so. This, as a claim for damages, is of so conjectural and remote a character, so dependent on so many contingencies, that I do not think any court would adopt it for an instant. There was nothing to prevent their sending the second cargo if they wished so to do, and there is no proof that they intended

so to do, or that any profit would have arisen therefrom.

On the whole, I am of opinion that the libellants have earned and are entitled to recover the balance due under the charter, $1,258; and interest from August 25, 1865.

Decree for libellants.

[On appeal to the circuit court the above decree was affirmed, with costs. Case No. 4,710.]