THE HERCULES.

LARSEN et al. v. S. P. SHOTTER CO.

(District Court, S. D. Georgia, E. D.   March 11, 1904.)

(Circuit Court, S. D. Georgia, E. D. March 11, 1904.)

1. SHIPPING—CONSTRUCTION OF CHARTER—BREACH BY REFUSAL TO ACCEPT VESSEL.

While loading at Savannah, a ship was chartered for a subsequent voyage from that port, the charter providing that she should be tight, staunch, strong, and in every way fitted for the voyage; that she should proceed in ballast to Savannah after having discharged her present cargo in Europe. There was no stipulation in respect to the time of her return, and the charter contained a provision that the dangers of the sea, fire, and navigation of every nature and kind be always mutually excepted. In passing out from Savannah in tow she struck on a bar, and was injured to such an extent that, after having discharged her cargo at Hamburg, it was found necessary to make repairs, and, there being a strike among the ship carpenters in Hamburg, she was taken to a port in Norway, the trip requiring two days, where the repairs were made as required by the official board of survey, and, as shown by the evidence, in as short a time as possible. The broker who negotiated the charter at once advised the charterers of the situation, and submitted an offer by the owners to substitute another vessel or to cancel the charter, which was refused, the charterers claiming a reduction of the freight on account of the delay. A subsequent offer of the same kind was also refused, and after completing her repairs the ship sailed for Savannah, where she was entered at the customhouse by the charterers, but after she had remained in port nearly a month they gave notice that they waived their claim for a reduction in the freight and had canceled the charter. Held, that the mutual exception in the charter of dangers of the sea took effect at once on its execution, from which time the owners became bound thereby to put the ship in a seaworthy condition and to proceed with reasonable dispatch until she was delivered for loading, subject to such exception, and that therefore the unavoidable delay caused by such perils afforded no ground for the refusal of the charterers to accept and load the vessel; nor was the taking of the ship to the port where she was repaired such a deviation from the contemplated prior voyage as released the charterers under the circumstances shown, or entitled them to damages for the delay, especially after their repeated refusal of the owners' offer to cancel.

129 F.—60

In Admiralty. Cross-actions in the District and Circuit Courts, respectively, consolidated by consent and heard before Judge SPEER, as judge of both courts, without a jury.

Samuel B. Adams and Davis Freeman, for J. A. Larsen and others.
George W. Owens and Walter G. Charlton, for S. P. Shotter Co.

SPEER, District Judge. This proceeding originated in an action in the city court of Savannah by J. A. Larsen et al., plaintiffs here, and owners of the ship Hercules. It was an action for damages for breach of a charter party of that vessel by the defendant, the S. P. Shotter Company. The defendant, while carrying on its business in the city of Savannah, in this district, is a corporation of the state of West Virginia, and caused the removal of the case to this court. After the case was removed, the Shotter Company filed a libel claiming damages against the plaintiffs for alleged breach of the charter party on their part.

While there is much apparent conflict in the testimony, a careful analysis of the evidence, in connection with the admissions in the defendant's answer, discloses that there is little real conflict as to the material facts. The charter party was made on the 5th day of March, 1901. It was for a voyage from Savannah to certain ports, for orders to discharge at certain other safe ports, to be designated at charterer's option. It was expressly stipulated that the vessel shall be tight, staunch, strong, and in every way fitted for such a voyage. The Shotter Company engaged to provide and furnish for the said vessel a full and complete cargo of spirits of turpentine and rosin. The charterer agreed to pay four shillings British sterling per barrel of 40 gallons gross American gauge of barrels of spirits of turpentine, and two shillings and nine pence British sterling per barrel of 310 pounds gross American weight for rosin, all with 5 per cent. primage, payable in cash on proper discharge of cargo, free of discount or interest, three pence British sterling per barrel to be deducted from above rates if vessel is ordered, on signing bills of lading, to any direct port as above. It was further agreed that there should be 25 lay days for loading and discharging cargo, and that, for each and every day's detention by default of the Shotter Company or agent, 18 pounds British sterling per day, day by day, shall be paid by the charterer. It provided that the dangers of the sea, fire, and navigation of every nature and kind be always mutually excepted. It is not without importance to observe that H. Clarkson & Co., of London, acted as agents for the plaintiffs and for the Shotter Company. The final stipulation of the charter party is: "It is understood that the vessel proceeds to Savannah in ballast, after having discharged her present cargo in Europe." It is to be observed that there was no time stipulated in the charter party in which the ship should return, no such expression as "all convenient speed," but it is not questioned that her owners were under obligation to return her within a reasonable time.

Sailing from Savannah with full cargo after this charter party was executed and in operation, and attempting, while in charge of a pilot and in tow by a tug, to cross the bar at low neap tide, the Hercules

struck four times. That the ship by this misadventure was seriously injured is not, in the opinion of the court, fairly debatable. It was an old vessel, having been launched in 1868. The pilot, it is true, expressed the opinion that she could not have proceeded on the voyage had she sustained the injuries described by the witnesses for the plaintiff. This opinion is not deemed important, in view of the fact that she did proceed, and in view, also, of the positive testimony of several witnesses who did the actual work of repairing her in a Norwegian shipyard at Porsgrund. The testimony of Halvor Nielson, of the firm of Nielson & Backa, at whose shipyard the Hercules was repaired, is as follows:

"My firm repaired the ship 'Hercules,' of Skion, in Porsgrund, during the summer of 1901, owing to damage done to ship, said to have been done when the vessel crossed the bar on leaving Savannah en route for Hamburg. The repairs carried out by my firm were ordered to be done by the official surveyors—'Det norske Veritas' (the Norwegian Veritas). No repairs were made except those required by the above-named authorities. The repairs consisted in the following: A new piece of false keel under the forefoot, partially new inner and outer forestem. This had given way or started, especially between the ports, and was split in the middle where bolted. The materials were otherwise sound. The bow fastenings had to be loosened, partially removed, in order to get the inner stem in place, and consequently had to be rebolted and refastened. This work was difficult to effect, and took a very long time to do, although much overtime was spent on it, as only three to five men could be used at this work at a time. The sternpost was started and had to be completely rebolted, as well as in part further fastenings. The lower rudder metals were broken and had to be renewed. The false keel aft was split, and had to be replaced by two larger pieces. Besides which, the ship was retrenailed from beneath the chainbolts down to about six or seven feet from the keel. The ship was calked from keel to gunwale, and remetaled. The mizzenmast was repaired with three new pieces of pitchpine deals and iron hoops, and this work was carried out whilst the other repairs were proceeding, and without any detention to these."

There is other testimony as to the character of these injuries, but much of it is hearsay, and the conclusion of the court is based upon the testimony of the shipwrights and artisans above referred to. The injuries were, as stated, quite serious, but the vessel proceeded on her way to Hamburg, and there unloaded. It appears further from the testimony that her captain refused to take her out on another voyage until she was repaired. It is equally clear from the evidence that a strike was in progress among the ship carpenters at Hamburg, and that, while it may have been possible to have repaired her there, it was judicious, and in the interest of the charterer and the owners as well, to have the repairs made at Porsgrund, in Norway. This was only a two days' voyage from Hamburg.

When the Hercules reached Porsgrund she was surveyed by the official board, who enjoy and no doubt deserve the honorable title of the Norwegian Veritas. This body, created by Norwegian law with necessary authority, ordered certain additional repairs, and according to the testimony of Hans A. Oelsen, who was a shipbuilder for 35 years, and was present at the shipyard, the repairs were expeditiously made, a number of laborers, varying from 25 to 30, being continuously employed, and as many calkers and carpenters as could be reasonably brought to work on the repairs. These repairs were completed on Sep-

tember 22, 1901. They were so salutary in their effect upon the ship that she retained her class in the Norwegian Veritas. Oelsen testifies:

"As a ship builder and foreman of many years standing, and having had considerable experience in such matters, I may safely say that I am of the opinion that the said repairs were carried out with the utmost possible dispatch, and could, to the best of my belief and knowledge, not have been effected better or quicker elsewhere."

Mr. Halvor Nielson, who is a shipbuilder and a shipyard proprietor, testified to the same effect.

It will be recalled that H. Clarkson & Co., 112 Fenchurch street, London, were the brokers who negotiated this charter party for the contracting parties on May 25, 1901. These mutual agents by letter notified the Shotter Company of the plight of the Hercules.

"The owners of this vessel inform us," write these gentlemen, "that she has been aground and leaky and recommended to recopper (we understand she will also reclass). Owing to the carpenters' strike at Hamburg, owners have been obliged to take her to Norway in tow, whereby we understand no delay will occur. Owners might give you a substitute for earlier loading, or cancel charter if you should prefer, and we now await your cable on receipt if you have any proposal to make; if we don't hear from you by cable we shall understand you will load her as per charter."

This letter reached the defendant on June 7, 1901. This, according to the testimony of Mr. Einar Storm Trosdal, chief clerk of the foreign department of the Shotter Company, was some months before the presence of the Hercules at Savannah was indispensable. Indeed, he stated that he supposed that a cargo could have been provided for her as late as October. Notwithstanding this fact, the Shotter Company immediately (that is to say, on June 7) reply by cable:

"Charterer will not cancel charter Referring to your letter of May 25th Hercules we claim reduction 1½d."

The Shotter Company supplemented this telegram with the letter to Clarkson & Co. of June 8th, from which we extract the following:

"We do not approve of owners doing as they please in such matters. In our many years experience we have found Norwegian ship owners very strict indeed, in cases where we might deviate a little from the terms laid down in the charter party. As a matter of fact when we want any privilege or option we have to pay very heavy indeed, and there is no reason why we should be any more lenient to them than they are to us. As a matter of fact when the owners of the Hercules undertook to send their vessel to Norway for repairs they did so at their own peril, because we contend that it was a violation of the contract with us. We cabled you that we would consent provided owners make an allowance of 1½d. and await your reply."

This attitude of the Shotter Company does not appear to be wholly justifiable. It is, in effect, to make the Hercules a vicarious sufferer for the alleged sharp practices of other Norwegian owners. This does not seem maintainable upon any principle of admiralty law, save, perhaps, such as relate to letters of marque and reprisal, which it is superfluous to observe are only issued pursuant to act of Congress, and in time of war, or near thereto.

Clarkson & Co. having received this cable, write on June 8th:

"We have informed owners that you claim a reduction of 1½d. off the rate, because ship was sent from Hamburg to Norway for repair."

On June 12th, Clarkson & Co., who, as stated, acted as the joint broker of the owners of the Hercules and of the Shotter Company, write:

"We are sorry and must say rather surprised at the view you are taking in this matter and cannot see why you should claim any reduction, as it certainly has been in your interest to take the vessel over to Norway for repairs instead of having the same effected at Hamburg, where we understand strikes are still going on and there can be no doubt that the vessel will now be at yours much sooner than would have been the case if she had repaired at Hamburg. She will be remetalled and reclassed A2. She is being put in first class order, which naturally will make a great difference to you in effecting the insurance. Personally we think you ought to waive the whole question of reduction or if you should prefer it to cancel the charter."

To this letter it appears that the Shotter Company reply on June 13th:

"We will only refer you to our letter of the 8th instant where we wrote fully about this vessel. We therefore cabled you we would not cancel charter but insisted on getting allowance of 1½d."

On August 3, 1901, the Clarkson Company write to the Shotter Company:

"As cabled you the Hercules is expected ready about the end of this month. Awaiting further news we remain."

On August 27th the Shotter Company write to Clarkson & Co.:

"We take it for granted that by this time you will hardly agree with the owners of the vessel that time could be saved by having them go to Norway for repairs. Whilst we have not expressed ourselves plainly on this subject before, we will say that we consider it perfectly absurd on the part of the owners of that vessel to assume that they had the right to take the vessel to Norway for repairs without our permission. We consider that the owners violated their contract with us, and we shall see that the vessel carries part of the burden and loss which we have suffered."

Even at this late day it appears that there is no intimation on the part of the Shotter Company that they have any purpose to cancel the charter party. Their purpose, as disclosed, is to obtain a reduction of freights, or otherwise make the owners of the Hercules share their loss, whatever it may prove to be, or account to them in damages. On November 9, 1901, Clarkson & Co. write to Shotter Company:

"In the case of the Hercules you will remember that as soon as we informed you of this vessel having gone to Norway, owners made you a proposal to cancel C. P. to which you would not agree, but said that you would load the ship at a reduction of 1½d. so we cannot see how you claim more than this reduction from the owners. We can assure you that the owners of both ships have used every diligence to get vessels repaired."

Her repairs having been finally completed, and the Shotter Company, so far as the correspondence discloses, remaining inexorable in their determination not to cancel the charter party, but to insist upon a reduction of freight, the owners of the Hercules sent her on the long voyage through the North Sea and across the Atlantic to Savannah. She reached Savannah on the 28th day of November, was entered at the customhouse by Dahl, the agent of Shotter, who advanced the captain $100. Even now there appears to be no immediate determination of the Shotter Company to cancel the charter party. The Hercules is

in the harbor from the date last mentioned until December 24th, when Shotter Company write Clarkson & Co. as follows:

"We have decided to waive the claim for damages against the vessel, but we have notified the captain that we have cancelled charter party. We regret this very much indeed, but considering the high-handed position the owners took, they could hardly expect better treatment."

Now, whatever may be the technical rule which it is insisted authorized the Shotter Company to withhold cancellation until the ship arrived at the port of loading, the application of such a rule here seems unconscionable. In the meantime the Hercules is claiming demurrage from the 2d day of December, and finally succeeds in getting another charter from the Patterson Downing Company on the 31st day of December, 1901, and sails January 26, 1902. The Shotter Company contend, on account of the failure of the Hercules to come within a reasonable time, that they were compelled to charter another vessel or vessels to take the cargo provided for her, at a considerable loss to them. This loss was stated in their plea in the removed case to be $381.04. In their libel filed in this court, and sworn to by Mr. Shotter, it is stated to be $1,000, or other large sum. They insist that their conduct in repudiating the charter party is justifiable, first, because there was a deviation in the voyage of the Hercules after that instrument was executed, and, secondly, because they were under no obligation to cancel the charter party until the Hercules returned to the port of destination; that is, to Savannah. The court is unable to perceive any reasons under the circumstances which would justify the Shotter Company in repudiating this charter party on either ground. The obligations of that instrument were always mutually excepted from the dangers of navigation. The injury resulted from one of those dangers. Repairs were unquestionably necessary. It is clear that they could not be so well made at Hamburg as two days away at Porsgrund. That they could have been made at Savannah, where the injuries were sustained, is not contended. There were no adequate facilities here. It was stipulated in the charter party that the vessel should be staunch, sound, and seaworthy. The owners, after the misadventure at Tybee, took the proper course to make it so.

It is, however, insisted that this qualification relates to the voyage to be made for the charterer, and not to the condition of the ship while going to the owners' port of discharge, nor to any detention made necessary by that condition. The case of Porteous v. Williams et al., 115 N. Y. 116, 21 N. E. 711, is cited in support of this contention. It is true that certain language of the opinion in that case, Justice Danforth delivering the opinion for the court, seems to support this proposition of the defendant's counsel, but in that case, to use the language of the court:

"The express agreement of the owner required the ship, after discharging the cargo then on board with 'all convenient speed,' to sail and proceed to the port of the charterer. No deviation was provided for, nor detention for any cause, save the necessary delay of unloading."

The qualification in the charter party before the court seems much broader: "The dangers of the sea, fire and navigation of every nature and kind always mutually excepted." Besides, in the case of the Por-

teous v. Williams, the language used by the court may, we think, be regarded as obiter. This is defined to be an opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication. 1 Bouvier, p. 567. As the question to be determined there was whether a nonsuit of the owners was justifiable, the court holding, favorably to the owners, that the nonsuit was improperly granted, and that the case ought to have been submitted to a jury, the observations above referred to, which favor the charterer, were therefore not necessary to the determination of the issue under consideration. Indeed, it seems to have been discussed as an abstract proposition along with, to quote the language of the learned justice, "some other propositions none of which in the present aspect of the case would permit the case to be taken from the jury, and it should be sent to them."

On the other hand, there are two carefully considered cases of the admiralty courts of the United States which adjudicate the contrary doctrine. They are the decisions of the District Court in The Star of Hope, reported in 1 Hask. 36, Fed. Cas. No. 13,312, decision by Judge Fox, of the District of Maine, and on an appeal taken from that decision, which was affirmed on circuit by Associate Justice Clifford, of the Supreme Court. 8 Fed. Cas. 1115, No. 4,710. That case is singularly like the case at bar, and the opinions of both of the learned judges are supported by a plentiful reference to authorities of the most convincing character. In that case the disabilities arose through a misadventure in the navigation of the vessel when it was dispatched from Boston to Farmingdale, in Maine, where it was expressly stipulated that the charter party should commence, and on page 42, Judge Fox, after citing a number of cases supporting the obligation of the charterer when the vessel is delayed for repairs, remarks:

"This principle is so well established, that I do not understand it as questioned by the learned counsel for respondent; but it is contended that, admitting such to be the law when the vessel meets with disasters in the prosecution of the voyage, it is not applicable to the present case, as the voyages stipulated for in charter had not yet commenced. It is very certain that the vessel was bound to proceed from Boston to Farmingdale under implied conditions, as the charter party is silent on this subject; and it is difficult for me to find satisfactory reasons why any other conditions should arise or be implied, in relation to this portion of her undertaking, than the law would imply in case the charter had merely said, 'vessel to proceed from Boston to Farmingdale,' or the charter had commenced at Boston, and had provided for the vessel going in ballast from Boston to Farmingdale and load; and in these cases, if the vessel had been delayed by storms and needed repair, and so was compelled to refit, and delay was occasioned thereby, neither party would have been exonerated from the performance of the contract, if the vessel was seasonably repaired and arrived at the port of loading."

On page 45 the court continues:

"I am therefore of opinion that the shipowners in this case are under the same liabilities as to delays and risks from dangers of the sea as they would have been under a charter commencing at Boston, and binding them to send their vessel to Farmingdale for a cargo. In that case they would not assume the risks and delays from perils of the sea, and they did not under the present agreement."

The case at bar is much stronger than that discussed by Judge Fox, for in the charter party before the court a stipulation was inserted in writing, as follows: "It is understood that the vessel proceeds to Sa-

vannah in ballast after having discharged her present cargo in Europe." This stipulation was made while the vessel was in Savannah. It necessarily followed that her voyage to Europe was in contemplation of the parties, and therefore the agreement that detention resulting from the dangers of navigation should be mutually excepted would not avoid the contract under the stringent clause on that subject above quoted.

The opinion of Justice Clifford in the same case, reported under the title Fearing v. Cheeseman et al., 8 Fed. Cas. 1115, No. 4,710, is also highly valuable. Discussing the contention that the charter party was not to attach until the vessel arrived at the place where it was expressly stipulated the charter party should begin, the learned circuit justice remarks:

"The contract became operative when the charter party was executed and delivered. The obligation of the shipowners to put the vessel in a seaworthy condition, and cause her to sail for the place of loading within a reasonable time, commenced when the charter party became operative, and continued in force till the covenants were fulfilled. Performance of that implied covenant was as much required by the charter party as that notice of readiness of the vessel to receive cargo be given on her arrival at the place of loading. Such notice could not properly be given before the vessel actually arrived, and the implied requirement was that she should proceed there with reasonable dispatch, the dangers of the seas and navigation excepted. Unavoidable delay arising from these causes would not discharge the charterers from their covenant to load the vessel, unless the delay was so great as to frustrate the voyage or deprive the freighter of the benefit of his contract. Where the delay ensues from unforeseen causes, but the voyage is not frustrated, the charterer is entitled to his claim for damages, as compensation for any injury he may sustain."

The owners in this case seem to have acted with entire frankness, and with marked consideration for the rights of the Shotter Company. They appreciated the fact that there might be some delay to that company, and, as soon as their ship was brought to the shipyard at Porsgrund, they communicated with the Shotter Company, offering to substitute another vessel, or to cancel the charter party. This proposition, as we have seen, the latter peremptorily refused to accept. No interest or consideration prompting the shipowners to cancel the charter party appears anywhere in the evidence. It was their interest to carry it out. It was, however, from the condition of their vessel, absolutely impossible for them to do so as soon as the Shotter Company wished; but instead of accepting their proposition to cancel the contract and allow them to secure a vessel elsewhere, it appears that the defendant company, aware the Hercules could not return to Savannah as soon as had been perhaps contemplated, while holding them to the contract, seizes upon the misfortune of the owner as a basis to exact a reduction in their freight charges. The mutual agent of the contracting parties, by reasonable and well-grounded appeals by letter to the consideration of the Shotter Company, seeks to change their ultimatum. This, however, is unsuccessful. At no time does the Shotter Company definitely cancel the charter party until long after the Hercules has reached the port of Savannah and is awaiting her cargo. Then the defendant waives its claim for damages and repudiates the contract. This can be considered as nothing less than an insistence upon the part of the Shotter Company that the Hercules shall yet make her voyage under the contract.

The opinion of the court is that, in waiving their claim for damages, the Shotter Company waive all right to take affirmative action against the Hercules for a delay which, as we have seen, was not unreasonable, and was occasioned by dangers of navigation. And it was no longer optional with the Shotter Company to adopt the arbitrary and oppressive action indicated by this letter.

In view of the uncontradicted evidence that the repairs were made as expeditiously as possible, and that the additional repairs ordered by the Norwegian Veritas were made at the same time with those rendered necessary by the grounding on Tybee bar, the whole contention of unreasonable delay by the Shotter Company must depend upon four days' voyage of the Hercules from Hamburg to Porsgrund and return. That the venture of the Shotter Company was not wholly frustrated is evidence by the fact that, after refusing the offer of the Hercules owners to substitute another ship, for a small additional charge they secured another vessel.

The court is then of the opinion that the claim for damages set forth by the libel of the Shotter Company must be disallowed. We are further of the opinion that the plaintiff is entitled to recover damages for breach of the charter party, and for all demurrage sustained during the period when the Hercules lay in the harbor of Savannah while attempting to obtain cargo. It would, however, seem equitable, if the Shotter Company, as contended, was obliged, at a greater rate of freight than that stipulated in the charter party under consideration, to charter another vessel to take cargo provided for the Hercules, that the damages recoverable by the owners of the Hercules should be reduced by an amount equaling the sum of the increased freight charges. An inquiry will be ordered before the master to ascertain: First, was the Shotter Company compelled to obtain another vessel or vessels to carry the amount of cargo which would have been transported by the Hercules but for the delay? Second, what increased freight rate, if any, was paid by Shotter Company for the transportation of such cargo? And, third, the amount of damages sustained by the Hercules because of the liability of the Shotter Company for the breach of its charter party, and for the demurrage resulting therefrom. A decree will be rendered for the plaintiffs for the amount thus found, less the sum of the increased charges, if any, above those fixed in the charter party, which were paid by the Shotter Company for the transportation of the cargo intended for the Hercules. All costs will be allowed against the Shotter Company.